# CASES

ADJUDGED IN

## THE COURT OF CHANCERY

### OF THE STATE OF NEW-JERSEY.

JANUARY TERM, 1836.

---

The ADMINISTRATORS of JOSEPH WHITE, deceased, v. HUM-PHREY WILLIAMS and others.

If a mortgage deed is prepared agreeably to the intention and instruction of the parties, reading it erroneously to the mortgagor before execution will not avoid it.

When a deed is executed by the grantor, and deposited with a third person until the grantor shall have an opportunity of acknowleding it, and then to be delivered to the grantee ; it is not an escrow, nor can the grantor avoid the deed by refusing to acknowledge it.

A suit for the foreclosure of a mortgage is not a personal action. It is a proceeding *in rem* against the land, not against the person of the debtor, and the defendant will not be permitted to set off any demand he may have against the mortgage debt.*

Nothing can be set up against the incumbrance except payment, which operates directly as a release of the incumbrance, *pro tanto.*

BILL for foreclosure, filed by the administrators of the mortgagee, against the mortgagor, and the purchasers of the equity

---

* Accord. 4 *John. Chan. R.* 616; *Troup* v. *Haight*, 1 *Hopkins*, 239. See also *Pettat* v. *Ellis*, 9 *Vesey*, 563; 3 *Powell on Mort.* 945, a. Note W.

But under the revised statutes of New-York, (2 *Rev. Stat.* 174, sec. 40,) setoffs are allowed upon a suit for foreclosure, as in actions at law : *Chapman* v. *Robertson*, 6 *Paige*, 629 ; *Holden* v. *Gilbert*, 7 *Paige*, 211. See also *Roosevelt* v. *Bank of Niagara*, *Hopkins*, 579.

of redemption. The answer admits the mortgage, but sets up various grounds of defence in avoidance of the claim, which are stated in the opinion of the chancellor. The cause was heard upon bill, answer, replication and proofs.

*Randolph* and *Scott,* for complainants.

*Ryall* and *Wall,* for defendants.

THE CHANCELLOR. The bill was filed to foreclose the equity of redemption in lands mortgaged by Humphrey Williams to Joseph White, by deed of mortgage bearing date the twenty-fifth day of April, eighteen hundred and thirty-one, and registered on the thirty-first day of March, eighteen hundred and thirty-two. The amount of money secured by the mortgage, was five hundred and fifty-five dollars and seventy cents. John Field and Curtis Williams are purchasers of the equity of redemption, by deed bearing date the third day of April, eighteen hundred and thirty-two.

The defendants, in their answer, set up various matters of defence. They admit that Williams was, at the time of the giving of the mortgage, seized of a farm in Shrewsbury of one hundred acres, more or less ; and say that Joseph White was a man of singular and parsimonious habits, without any family ; that every winter except one, from eighteen hundred and five and eighteen hundred and six, until the time of his death, in March, eighteen hundred and thirty-two, he had been in the habit of living and boarding at the house of Humphrey Williams, until eighteen hundred and twenty-nine, at the expense of Humphrey Williams, and from eighteen hundred and twenty-nine to eighteen hundred and thirty-two, at the expense of Curtis Williams; that he commenced his visits at the beginning of winter, and in the spring following he would generally proceed to Newark, where he would rest until the fall following, and then return ; that during the winter he generally employed himself in making wooden shovels, which he sold for his own use and benefit ; that

48

during these several visits, during the early part of them, he·
lent to Humphrey Williams, at different times, the sum of fifty
dollars, and one hundred and fifty dollars, for which Humphrey
gave his notes, with ,Daniel Williams as his surety on one of
them ; and afterwards gave him two other notes for small amounts·
of fifteen dollars each, for interest money ; that at that time and
at other times, White told· Humphrey and Curtis Williams that
these notes should be settled in his board and living, and that
they should not be brought against him ; and that during all·
this time White never paid any thing for his board, and the·
whole claim remains unpaid ; that White was extremely filthy
in his habits, and nothing but the promises before stated, and
the general inoffensive character of White, induced defendant to·
keep him in his family. His board, on the average, was two·
and a half months for twenty-two winters, and was worth two·
dollars and fifty cents per week. In the spring of eighteen hun-  ,
dred and thirty-two Humphrey Williams was taken very ill, and·
as he was getting better, White told him he was going away,·
and unless he, Williams, would give him a mortgage for the
money due him, he would have him arrested immediately. The·
defendant, Humphrey Williams, being seventy-seven years old,·
weak and infirm, told him he would do any thing to prevent such
a course ; and without consulting with his family, Williams went
with White to the store of Stephen Edwards, about half a mile·
off ; that while there White became very much intoxicated, and
threatened Williams that unless he signed the bond and mortgage
then preparing by Edwards, he would take him off to the court-
house. Williams understood Edwards and White that the mort-
gage only included twenty acres of his farm. Being weak and
alarmed, the papers were executed, without any allowance for
board, the defendant, Williams, in his agitation having forgotten
it, not knowing what he was doing.

The answer goes on further to state, that when the bond and
mortgage were executed, Williams was not indebted to White,·
but White was indebted to Williams in a considerable balance ;·
that Williams requested afterwards· of White and Edwards the·

[Adm'rs of White v. Williams et al.]

notes for which the mortgage had been given, which they refused to deliver up, and he has never been able to get sight of them; that White went to Newark the next morning. The defendants further state, that they believe the bond has been altered in a material part, viz. in its date, being altered from eighteen hundred and thirty-one to eighteen hundred and thirty-three, without the consent of the defendants or either of them. They also set up that White did not intend to charge Williams with the amount of the notes, and on one occasion directed one Britton White to destroy them in case he, White, should die; and that in his last illness, about five hours before his death, he directed Drummond White to go and get the bond and mortgage and notes of Stephen Edwards; and that Edwards refused to deliver them up, saying he would not do it if White came for them himself; and thus the mortgage was not only fraudulently obtained, but fraudulently altered and kept in existence against the wishes of Joseph White. They state also their belief that the mortgage was read to Williams as including only twenty acres; that the mortgage was never proved or acknowledged till after the death of White, and was then proved on the thirtieth day of March, eighteen hundred and thirty-two, before John P. Lewis, one of the complainants, in his character of commissioner, by Stephen Edwards, the subscribing witness; and that on the next day administration of the estate was committed to said Lewis and his co-administrator. They further state, that Lewis has been purchasing up the claims of some of the heirs at law for a few dollars, and that he is attempting a fraudulent speculation.

A replication has been filed, and much testimony taken on both side.

On a careful review of the whole evidence, I am of opinion,

1. That there is not sufficient proof to justify a conclusion that the bond and mortgage were without consideration, and fraudulently obtained.

The notes given at different times by Williams to White, for money borrowed and for interest, formed the consideration of the mortgage. The honesty of these notes is not disputed. The

[Adm'rs of White v. Williams et al.]

declarations of White, who is represented to have been an eccentric man, that he did not mean Williams to pay the notes, and that he, Williams, had had a great deal of trouble with him, and other declarations of like character, are all overcome by the fact that Williams afterwards, upon the requirement of White, gave a bond and mortgage for the whole amount. Nor do I see any fraud in the transaction to vitiate it. It is alleged, to be sure, that Williams had been sick, and was still feeble, and that in his weak state he was overcome by the threats of White that he would send him to the court-house if he did not comply. There is proof that he had been sick, and was still weak, though convalescent; but he was able to walk from his own dwelling to the store of Edwards, a distance of half a mile, and remain there a considerable part of the afternoon in the transaction of business. His signatures to the bond and mortgage are written with a remarkably firm and steady hand; and he certainly knew what he had been doing, for in returning home, he called at Daniel Williams's, who was security on one of the notes, and told him he need not be afraid of being security any longer, as he now had it fixed. The testimony of the defendants' witnesses as to the situation of Williams at the time, is very vague and indefinite, and comes far short of proving that he was in such a state as to be unable to attend to plain business, or that he was so alarmed and frightened as not to know what he was doing, and actually forgot that he had a claim against White which would more than meet the claim which White had against him, and therefore that there was nothing due. The allegation in the answer that White threatened to arrest him and send him to the court-house, is not sustained by any kind of proof whatever. The testimony of Stephen Edwards, John Woolley and Joseph H. Doty, repudiates the idea that there was any fraud or contrivance made use of when the mortgage and bond were executed.

2. It is alleged that the mortgage was read as conveying twenty acres, when in fact it conveys forty acres, and four witnesses have sworn to it, viz. Gideon Barker, Britton White, jr.

Walter Curtis, and Drummond White. I am inclined, however, to believe that they are under a mistake. Their testimony in the aggregate is not satisfactory. They appear to have paid but little attention to what was going on, and do not testify in a manner calculated to inspire confidence. Barker says he heard the bond and mortgage read over twice or three times, and is confident the mortgage was read as including only twenty acres, but he cannot recollect any other particular. Again he says, he heard them read once or twice, and he does not know but three times; he does not know whether both papers specified the twenty acres or not, nor can he tell what sum was in them. So Walter Curtis heard the mortgage read, and is sure it was read as for twenty acres; but he knows nothing of the sum for which the mortgage was given; does not remember whether one or two papers were read, but "supposes he heard them all read, as he, Edwards, was long enough reading of them." He heard nothing about the money, when it was to be paid. Britton White, jr. says, Edwards was reading the mortgage when he went in the store; a good many people were there; he did not hear any thing about it, as "to whom it was given from," as he did not pay much attention; only he heard Edwards tell it was for twenty acres as he was reading it. He knows nothing more about it, and cannot say whether there were one or two papers, or for what amount, or to or by whom they were made. Drummond White is very positive it was read so as to include twenty acres of land, and no more. He heard only one paper read; thinks that Edwards was reading, or just beginning to read, when he went into the store. As near as he could tell by the reading of it, it was the mortgage he read. Witness says he did not see the face of the paper; he does not know what sum it was given for, nor when it was made payable, nor whether it was on a whole sheet or a half sheet. He thinks the mortgage was all in writing, and no print. He has good reason to think so; as they would not let Humphrey Williams see it, he tried to look at it himself. He wanted to see what was written, and whether it was correct or not, and he is certain it only read for

[Adm'rs of White v. Williams et al.]

twenty acres.   It will be seen that the evidence of these witness-
es is very loose on this point; and it is not a little remarkable,
that without paying any special attention to what was doing,
they should all recollect one particular matter and forget every
thing else.   There is an improbability about it, which is increas-
ed by the fact that there could be no motive for such a deception.
Twenty acres was just as sufficient for the purpose of security as
forty; and if it were not, there is nothing to show any agree-
ment that only twenty acres were to be embraced in the mort-
gage, or that Williams refused to give more.   The answer itself,
though by no means a cautious one, sets up no such pretence;
and the testimony of Edwards is positive that the instrument was
read as it was written; that it was read forty acres, and not
twenty acres, as is alleged.   I consider the evidence of Edwards
as much more weighty than that of casual bystanders, who paid
little or no attention to what was done or said, who had no in-
terest in it, and who give their evidence in a spirit not calculated
to make a favorable impression on the mind.

If, however, these witnesses should be correct in the matter
to which they have testified, and Edwards actually read the
mortgage as covering twenty acres only, instead of forty acres,
it will not vitiate the instrument unless it is shown to have been
done intentionally, with a view to defraud and deceive.   This is
not shown.   The strong presumption is the other way.   It is fair
to presume, that the instrument was prepared according to the
direction of the parties.   They came to him for a certain pur-
pose, and must have given him instructions, and known what
was to be done.   If, then, he prepared the instrument, and in
reading it read twenty acres, by mistake, when he should have
read forty acres, it will not avoid the instrument.   It is as it was
intended to be, and no injury is done.   I dismiss this part of the
defence as untenable.

3. It is insisted that the mortgage was never consummated
by delivery; that it was placed in the hands of Edwards as an
escrow, and was not to be given up until it was acknowledged by
the grantor.

[Adm'rs of White v. Williams et al.]

I do not perceive the force of this insistment; for if I rightly understand the facts, the delivery to Edwards could not have been the delivery of an escrow. The mortgage and notes were both left with him, and the notes were not to be given up until the mortgage was acknowledged, and until that time the mortgage was also to remain in his hands.

Generally speaking, when a deed is delivered by the grantor to a stranger, to be delivered to the grantee on the performance of some condition, it is considered an escrow; but in all cases the condition is to be performed by the grantee, and not by the grantor. The grantor has done all that was needful for him, to give complete effect to the instrument; he cannot by any subsequent act or omission or refusal of his, prevent his own deed from being operative. In this case, the act was to be done by the grantor, that is to say, he was to acknowledge the deed, and therefore it cannot be considered as an escrow. The intention of the parties cannot be misunderstood. When the mortgage was executed, there was no officer present competent to take an acknowledgment, and it was agreed that all the papers, the notes, bond and mortgage, should remain in the hands of Edwards until Williams should have an opportunity of acknowledging the mortgage, so that it might be registered, and then it was to be given to White, and the notes to Williams. This arrangement, however, did not put it in the power of Williams to avoid the mortgage by refusing to acknowledge it; and although Edwards might have refused to deliver up the papers either to the one party or the other, the rights of the parties would not have been affected by such refusal.

4. Again, it is strenuously insisted, that the claim of Humphrey Williams, one of the defendants, against the estate of White, for board, &c. should be inquired into in this suit, and referred to a master, as a setoff against the amount of the mortgage.

If there be any valid claim against the estate, it cannot be set off in this suit. This is a proceeding *in rem* against the land, and not against the person of the debtor. The ordinary princi-

ples of setoff, as understood in law or in equity, cannot be applied to cases of this kind.. There is no mutuality, and can be none. The real defendant is the land itself; and nothing can be set up against the incumbrance, except payment, which operates directly as a release of the incumbrance, *pro tanto.* This is not a personal action any more than the action of ejectment at law, and in neither, can the defendant be permitted to come into court with an offset. In the present case there would be a peculiar impropriety, if the sale of the equity of redemption is bona fide. For if the claim, supposing one to exist, should be allowed, it would simply relieve the lands in the hands of the purchasers, and could in no way enure to the benefit of the mortgagor, to whom the claim really belongs. This suit might have been brought, according to modern authorities, without making the mortgagor a party to the bill; and if this had been done, surely the other defendants, who are the holders of the equity of redemption, could not have set up by way of offset this personal claim of the mortgagor.

I do not find any thing in the evidence to warrant the belief that it was the agreement of the parties that the claim for boarding, &c. should operate as a payment of the mortgage, *per directum.* The very giving of the mortgage after all the services had been rendered, negatives the idea. If the debt had been actually paid at that time, there was no inducement to give the mortgage, and it was improper to do it. If there be any claim, it cannot be entertained here.

5. There is one other matter to be considered, and that is, the apparent erasure or alteration of the date of the bond.

The instrument was executed, doubtless, on the twenty-fifth day of April, eighteen hundred and thirty-one. The alteration is in the last word of the year. It was either written *three* and altered to *one*, or originally written *one* and altered to *three.* Edwards, the scrivener, cannot account for it. He has no recollection of it whatever. He thinks the word *three* is in his handwriting, but does not think he altered the word *one* to *three.* He says also, that if the alteration was made by him at all, it

was made before the execution of the bond, and in the presence of the parties.

The alteration is apparent. The principle of law admits of no dispute, that when a deed has been altered in an immaterial part, by the person to whom it belongs, after delivery, it will be avoided; and if it be altered in a material part, even by a stranger, the same result will follow. The alteration must be after the delivery: 1 *Shep. Touch.* 69. Where there is no memorandum or note made of the alteration, the time when it was made is a question of fact: *Den* v. *Wright*, 2 *Hals.* 175. The true inquiry in this case is, whether the erasure or alteration was made before or after the execution of the bond.

It is difficult to determine from inspection whether the word *one* or *three* was first written, but I think it evident that both were written by the same hand and pen, and that they were written by Edwards. He thinks the word *three* is in his handwriting, but says nothing of the word *one*. Being written by him, it must have been before the delivery of the bond; as he states himself that he made no alteration after the papers were executed. If the word *three* was first written by mistake, and altered afterwards to *one*, so as to conform to the truth, as is most probable, the matter is explained. If the *one* was altered to a *three*, it is impossible to account for it, and as the witness says, it must remain a mystery. I do not know that it is important for me to settle this difficulty. I am satisfied, from the appearance of the paper, the hand-writing, and the color of the ink, that the alteration was made by Edwards; and he having sworn that if made by him, it was made before the execution of the instrument, the instrument is not affected by it.

The defendants, in their defence, interposed some other difficulties in the way of recovery; such as, that the mortgage having been proved by the subscribing witness before John P. Lewis, one of the complainants, just before he took out letters of administration, and after it is supposed he had agreed to administer upon the property; and also that James T. White, the other administrator, had purchased the right of one of the next of kin of

[Adm'rs of White v. Williams et al.]

the intestate. The facts appear to be true; but they do not avoid the mortgage. The transactions were both legal. Their morality depends upon the good faith of the different parties; and this, the court sees no just ground to question.

Under this view of the case, the complainants are entitled to relief. Let it be referred to a master, in the usual way, to take an account.

Order accordingly.